# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 4:23-CR-380 SRC (PLC) |
| ) | |
| SOONY SAGGAR, et al, ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS' OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION REGARDING MOTION TO DISMISS INDICTMENT BASED ON THE COURT'S LACK OF JURISDICTION

"Under 28 U.S.C. § 636(b)(1), when a party objects to a magistrate judge's report and recommendation, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected; A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *United States v. Twiggs*, 2023 WL 7537044, at *3 (E.D. Mo. Nov. 14, 2023). Defendants object to the portion of the Report and Recommendation wherein Judge Cohen recommends denial of Defendants' Motion to Dismiss for Lack of Jurisdiction. *See* Doc. 80 at 9-14.

The question presented has two parts – (1) what was the founding-era meaning of the right to a Grand Jury as guaranteed under the Fifth Amendment to our Constitution? and (2) are the Supreme Court's prior references to "probable cause" dicta or precedence?[1] Neither the Government nor the Court below disputed Defendants' position that the understanding of the Fifth

---

[1] This motion will not result in a multitude of retroactive litigation. The Supreme Court in *Edwards v. Vannoy*, 141 S. Ct. 1547, 1551–52 (2021), rejected retroactive application completely, holding, "[i]t is time—probably long past time—to make explicit what has become increasingly apparent to bench and bar over the last 32 years: New procedural rules do not apply retroactively on federal collateral review. The watershed exception is moribund." *Id.*, at 1560.

1

Amendment right to a Grand Jury in 1791 entailed a standard of proof greater than probable cause. However, the Report and Recommendation asserted that prior Supreme Court cases were more than dicta, and thus controlling. Defendants respectfully disagree.

"The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now," *South Carolina v. United States,* 199 U.S. 437, 448 (1905), and, "the Constitution's guarantees cannot mean less today than they did the day they were adopted." *United States v. Haymond*, 139 S. Ct. 2369, 2376 (2019).

In relevant portion, the Fifth Amendment provides, *No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.*[2] While the Court below cited cases referencing a "probable cause" standard for federal grand juries, contrary to popular belief, such was not always the presumption and no Supreme Court decision has ever actually announced that the standard for indictment shall henceforth be "probable cause." Rather, modern courts have simply assumed that to be the standard. However, "[t]he Constitution demands more than the continued use of flawed criminal procedures." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020). The probable cause standard is contrary to the intent of the Founding Fathers, and consequently, contrary to the Constitution. Respectfully, the Court below got it wrong.

Under what Justice Scalia termed "original public meaning" originalism,[3] the Supreme Court has made clear, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct.

---

[2] Currently, in the Eastern District of Missouri, each new grand jury is instructed as to the standard of proof. Specifically, they are instructed that they need only find "probable cause." https://www.moed.uscourts.gov/sites/moed/files/documents/Jury_HandbookGrandJurors.pdf. Throughout the Handbook, "probable cause" is referenced eight times.

[3] Future-Justice Scalia said that the "expressions of the Framers" "are strong indications of what the most knowledgeable people of the time understood the words to mean." Antonin Scalia, Address Before the Attorney General's Conference on Economic Liberties in Washington, D.C. (June 14, 1986).

2111, 2136, (2022)(emphasis added). "[T]he scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, at 2137. The original *public* meaning of the Constitution governs constitutional interpretation, *District of Columbia* v. *Heller*, 554 U.S. 570, 605 (2008). "An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022).

In Ramos, 140 S. Ct. at 1394-1408, the Supreme Court looked back to the adoption of the Constitution and the Bill of Rights to determine that the Sixth Amendment's simple phrase "a jury trial" required a unanimous verdict. Likewise, to understand what the Founding Fathers meant when they said "indictment of a Grand Jury," the Court must consider what was understood back in 1791 when the Fifth Amendment was adopted.

## I. The Historical Evidence Demonstrates A Higher Standard of Proof

Defendants' sources to establish that "probable cause" was not the standard of proof incorporated into the Fifth Amendment are the same historical sources the Supreme Court most frequently utilizes when determining the public understanding of any of the Bill of Rights.

### A. Blackstone, The Supreme Court's "Preeminent Authority"

More than any other historical writer, the Supreme Court has on numerous occasions relied upon information from "[t]he celebrated and judicious Sir William Blackstone," *Calder v. Bull*, 3 U.S. 386, 391 (1798), whose work the Court said, "constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), who "described the prevailing practice in 18th-century England," *United States v. Williams,* 504 U.S. 36, 51, (1992), and "greatly influenced the generation that adopted the Constitution,*" Green v United States* 355 US 184, 187 (1957), was "a primary legal authority for 18th and 19th-century American lawyers,"

3

*Brown v Entertainment Merchants Association* 131 S Ct 2729, 2757 (2011), and was relied upon for "the history and role of the grand jury," *United States v. Calandra*, 414 U.S. 338, 343 (1974) and as the source "[a]s to the development of the grand jury as an institution here and in England." *Costello v. United States*, 350 U.S. 359, 363 (1956).[4] As the Court said in *United States v. Bolles*, 209 F. 682, 685 (W.D. Mo. 1913), "[t]he statement made by Blackstone . . . of the procedure before a grand jury, may be taken as a correct view of the procedure as it existed in his time."

In *Beavers v. Henkel,* 194 U.S. 73, 84 (1904), the Court quotes Blackstone, vol. 4, p. 303:

> 'This grand jury are previously instructed in the articles of their inquiry, by a charge from the judge who presides upon the bench. They then withdraw, to sit and receive indictments, which are preferred to them in the name of the King, but at the suit of any private prosecutor; and they are only to hear evidence on behalf of the prosecution; for the finding of an indictment is only in the nature of an inquiry or accusation, which is afterwards to be tried and determined; and the grand jury are only to inquire, upon their oaths, whether there be sufficient cause to call upon the party to answer it. **A grand jury, however, ought to be <u>thoroughly persuaded of the truth</u> of an indictment, so far as their evidence goes; and not to rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes.**' [5]

---

[4] *See, also, Schick v United States* 195 US 65, 69 (1904) ('Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. . . . undoubtedly, the framers of the Constitution were familiar with it'); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022)("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."); Gertz v. Robert Welch, Inc., 418 U.S. 323, 381 n.14 (1974) (White, J., dissenting) (referring to Blackstone as "the oracle of the common law in the mind of the American Framers"); *Green v. United States*, 356 U.S. 165, 186 (1958)("a Congress with a Judiciary Committee including members of the recent Constitutional Convention, who no doubt shared the prevailing views in the American Colonies of English law as expressed in Blackstone."). "Sir William Blackstone and his *Commentaries* . . . exercised a dominant and pervasive influence on America's political thought and legal development." Dennis R. Nolan, Sir William Blackstone and the New Am. Rep.: A Study of Intellectual Impact, 51 N.Y.U. L. Rev. 731 (1976). In fact, Thomas Jefferson in 1826 remarked how "Blackstone became the [law] student hornbook." 12 Thomas Jefferson, The Works of Thomas Jefferson 456 (P.L. Ford ed., 1905).

[5] Judges in multiple jurisdictions used Blackstone's wording in their charges to grand juries. *See, e.g., Gentlemen of the Grand Jury,* at 109 (Judge Houstoun's Charge, Chatham County, Georgia, January, 1792), at 570 (First Report of Judge Pickering's Charge to the Grand Jury, New Hampshire, September, 1790), at 726 (Judge George Turner, Northwest Territory, April 1794), at 1243 (Judge Thomas Waite, South Carolina, 1789); *Conniff v. Luzerne Cnty.,* 30 Pa. Super. 383, 385 (1906)("The measure of proof required to find a true bill is laid down by Blackstone (4 Comm. 303) as follows: 'In order to find a true bill a grand jury ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes; and not to rest satisfied merely on remote probabilities; a doctrine which might be applied to very oppressive purposes.'"); *Smith v. State*, 61 Miss. 754, 757 (1884).

4

However, as discussed further below, in *Beavers,* the Court simply assumed the probable cause standard without any discussion at all, notwithstanding that Blackstone articulated a standard higher than probable cause, i.e., "thoroughly persuaded of the truth."

Significantly, on multiple occasions, even the Government has acknowledged to the Supreme Court that Blackstone and other historical writers suggested a standard higher than probable cause:

> There are, it is true, occasional observations to the effect that since the accused has no chance to present evidence to the grand jury, **the "proof of the offence should be substantial"** (2 Hawkins, *Pleas of the Crown,* 367), and that a "grand jury * * * ought to **be thoroughly persuaded of the truth of an indictment**, so far as their evidence goes; and not rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes." 4 Blackstone, *Commentaries* (Chitty, 1866), 247. And see 1 Chitty, *Criminal Law* (1847 Ed.) 318-319. (emphasis added)

*Costello v. U.S.,* 1955 WL 72457 , 21 (U.S., 2006)(Brief for the United States).[6]

And, Blackstone was by no means an outlier in understanding the grand jury's proper standard of proof. Twenty-two years following adoption of the Amendment, in the first edition of Joseph Chitty's influential treatise, *Practical Treatise on the Criminal Law*, Chitty stated "great authorities have taken a more merciful view of the subject and . . . have argued that the grand inquest ought, as far as evidence before them goes, to be convinced of the guilt of the defendant." Joseph Chitty, 1 A PRACTICAL TREATISE ON THE CRIMINAL LAW 318 (Philadelphia 1816). Other noted authorities also included Sir John Somers, who addressed the issue in his

---

[6] *See also*, *United States v. Resendiz-Ponce*, 2006 WL 1794485 (U.S.), 28-29(Brief for the United States)(emphasis added)("Blackstone wrote that the function of the grand jury was to determine "whether there be sufficient cause to call upon the party to answer [the accusation]," and added **that "[a] grand jury *** ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes, and not to rest satisfied merely with remote probabilities." 4 William Blackstone, *Commentaries on the Laws of England* *303.");** *U.S. v. Williams*, 1991 WL 521337 (U.S.), 13 n.3 (Brief for the United States)(1991)("Blackstone added that the grand jury should not issue indictments based on 'remote possibilities,' but should be persuaded of their truth 'so far as their evidence goes.'").

*Security of English-Men's Lives,* a popular pamphlet reprinted in America as late as 1773. Somers stated that a probability standard was far too low, given the importance of the grand jury's task, but rather the grand jury must be "fully convinced" of the defendant's guilt. Somers rejected the view that the grand jury's charging standard should be no higher than the standard for arrest. For additional writers of the time identifying more than a probable cause standard, *see Probable Cause Revisited,* 68 Stan. L. Rev. at 527- 530 and accompanying notes.

### B. Supreme Court Justices Recognized For Their Knowledge Circa 1791

Supreme Court Justice Wilson, a Founding Father, and according to the Supreme Court, someone "who may be assumed to have known the current practice," told grand juries that mere probabilities was not acceptable.[7] Supreme Court Justice Field, whose grand jury charge, according to the Supreme Court, could not have "better illustrated" the importance of the grand jury, said, "you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury*."[8] Chief Justice Robert

---

[7] On April 20, 1790, a year before the Fifth Amendment's ratification, Supreme Court Justice Wilson charged the first federal circuit grand jury to sit in Pennsylvania, stating in relevant part:
> The doctrine, that a grand jury may rest satisfied merely with probabilities, is a doctrine, dangerous as well as unfounded: It is a doctrine, which may be applied to countenance and promote the vilest and most oppressive purposes: It may be used, in pernicious rotation, as a snare, in which the innocent may be entrapped, and as a screen, under the cover of which the guilty may escape.

James Wilson, Charge to the Grand Jury of the Circuit Court for the District of Pennsylvania (April 12, 1790), *in* 2 THE DOCUMENTARY HISTORY OF THE SUP.CT. OF THE UNITED STATES, 1789-1800 (Maeva Marcus ed., 1988). Notably, in 1906, the Supreme Court acknowledged that Chief Justice Wilson was someone "who may be assumed to have known the current practice."[7] *Hale v. Henkel*, 201 U.S. 43, 61 (1906), *overruled by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964).

[8] In 1872, then Supreme Court Justice Stephen J. Field in a charge made by him to a grand jury while sitting as Circuit Justice in the District of California, instructed the grand jury:
> To justify the finding of an indictment, you must be convinced, so far as the evidence before you goes, that the accused is guilty; in other words, you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury*.

*In re Charge to Grand Jury*, 30 F. Cas. 992, 994, 2 Sawy. 667 (C.C.D. Cal. 1872). Justice Field's charge to the grand jury was cited in *Hale v. Henkel*, 201 U.S. 43, 63, and *Hurtado v. People of State of California*, 110 U.S. 516, 555, (1884), and *Ex parte Bain*, 121 U.S. 1, 10, (1887)("The importance of the part played

6

Taney (who previously was the U.S. Attorney General, i.e., supervisor of all federal prosecutors), sitting as a Circuit Justice in Maryland in 1836 stated in charging a grand jury:

> But in our desire to bring the guilty to punishment, we must still take care to guard the innocent from injury; and every one is deemed to be innocent, until the contrary appears by sufficient legal proof. You will, therefore, in every case that may come before you, carefully weigh the testimony, and present no one, unless, in your deliberate judgment, the evidence before you is *sufficient*, in the absence of any other proof, *to justify the conviction of the party accused*. And this rule is the more proper, because he is not permitted to summon witnesses or adduce testimony to the grand jury, and your decision must be made without hearing his defence."

*Charge to Grand Jury*, 30 F. Cas. 998, 999 (C.C.D. Md. 1836)(emphasis added). In a similar vein, in 1800, Justice Samuel Chase, a Founding Father and signer of the Declaration of Independence, wrote that "every Grand Jury, before they find an indictment, should expect the same proof, and as satisfactory evidenc[e] of the guilt of the accused as the Petit Jury would require to Justify their verdict against him." Samuel Chase's Charge to the Grand Jury of the Circuit Court for the District of Pennsylvania, April 12, 1800, *in* 3 DOCUMENTARY HISTORY, at 408-409.

### C. The Most Thorough Scholarly Studies Found a Greater Standard of Proof in 1791

Multiple scholars who have studied the grand jury history circa 1791 have found a standard of proof greater than probable cause. In 2016, William Ortman published an article in the Stanford Law Review, *Probable Cause Revisited*. Ortman had conducted a deep dive into the collection of grand jury charges found in *Gentlemen of the Grand Jury*.[9] As Ortman said, "a careful examination

---

by the grand jury in England cannot be better illustrated than by the language of Justice FIELD, in a charge to a grand jury, reported in 2 Sawy. 667."), and by the U. S. Solicitor General *U.S. v. Cotton*, 2002 WL 264766 (U.S.), 26(Brief for the United States).

[9] In 2012, Stanton Krauss published *Gentlemen of the Grand Jury*, a two volume book containing every previously unknown but still surviving grand jury charge given by American judges prior to 1801. Krauss indicated, "Over the past two decades, I have read every publicly available eighteenth century American newspaper published in English and French and the surviving papers (published and unpublished) of seventeenth and eighteenth century American judges. I have also examined the books and pamphlets published here during those years. . . . These volumes include transcriptions of every complete, partial, or summarized grand jury charge known to have been given before 1801 in what was, or would become, this

7

of these charges reveals that among the American judges of the Founding era who expressed a view, Justice Wilson's position--that grand juries should return an indictment only on an evidentiary showing *more demanding* than probable cause--dominated. *Id*., at 520. Ortman noted that "Americans learned about their debate, and generally about the English law of grand juries, in three main ways: reprinted Whig tracts, legal treatises, and justice of the peace manuals," *id.*, at 526, and that American judges "overwhelmingly picked" a higher standard than "probable cause." Noting that the Tories advocated for probable cause standard and the Whigs were proponents of a higher standard, he wrote:

> As this and the next Subparts show, in Founding-era America, among judges who addressed the issue, the Whigs won.
> Several judges adopted Blackstone's "thoroughly persuaded" language. Judge Thomas Waites's 1789 charge to a South Carolina grand jury is typical of this approach: "[Y]our ought to be thoroughly persuaded of the truth of an indictment, as far as the evidence goes, before you assent to it; and ought not to send a person to his trial upon probable grounds only, and the mere presumption of criminality." Other charges told the grand jury to find an indictment only if it was "satisfied," "well satisfied," "fully satisf[ied],"[98] "convince[d]," or "well convinced" of the defendant's guilt. At least two judges incorporated the Whig idea that grand jurors should present a defendant for trial only if their "consciences" were "satisfied." Yet other judges instructed grand juries to find an indictment only with "the most unequivocal evidence," "moral certainty," evidence "sufficient to convict," the "most probable grounds," the "strongest appearance of criminality," or when it had no "reasonable cause of Doubt." **While these formulations offer a range of certainty levels, they share a common theme: all go beyond, and often far beyond, the bare "probable cause" criterion advanced by the English Tories.**

*Id.* at 530-31 (emphasis added). Ortman also found that, "[l]ike the Whigs before them, several Founding-era judges expressly criticized criminal charges based on "probabilities," often in part because, "judges connected a strict evidentiary requirement to the fact that grand jurors heard only the government's evidence."[10]

---

country." G*entlemen of the Grand Jury: The Surviving Grand Jury Charges from Colonial, State, and Lower Federal Courts before 1801*, vol. 1-2 (2012) (Stanton D. Krauss, ed.).

[10] Ortman did also note, "we know that at least six Founding-era American judges charged grand jurors to return an indictment on probable cause alone. . . . However, an argument could be made that even "probable cause" suggested a higher standard circa 1791 than it does today.  In Judge Lot Hall's charge to a grand

8

Similarly, Thomas Y. Davies, Professor of Law, University of Tennessee Knoxville College of Law, in *The Fictional Character of Law-and-Order Originalism*, 37 Wake Forest L. Rev. 239, 427–28 (2002), channeling Blackstone, wrote "at common law, **grand jurors were usually instructed not to indict unless they were persuaded, based on the prosecutor's evidence, of the 'truth' of the accusation.**" (emphasis added). And, Niki Kuckes, Professor of Law, Williams University School of Law, *"Retelling Grand Jury History"* published in Grand Jury 2.0: Modern Perspectives on the Grand Jury (Roger Anthony Fairfax, Jr. ed. 2011), wrote, "the historic tradition of hearing only the prosecutor's evidence went hand-in-hand with, and was integral to, **a far higher evidentiary standard than the modem test of probable cause**. . . . [T]he grand jury only heard from the prosecutor; but the grand jury rigorously evaluated the prosecutor's evidence **using a standard akin to the trial jury's reasonable doubt standard**." *Id.*, at 143-146 (emphasis added).

### D.  The Government and Court Below Offered No Relevant Historical Evidence

The U.S. Solicitor General told the Supreme Court, "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *United States v. Resendiz-Ponce,* 2006 WL 1794485 (U.S.), 28 (Brief for the United States). Yet, the Government's response to Defendants' motion offered no evidence whatsoever relating to how the "Founding generation understood" the right to only be indicted by a Grand Jury.

 "In recent years, this Court . . . [i]ncreasingly, has emphasized original meaning in constitutional interpretation." *Haaland v. Brackeen*, 599 U.S. 255 (2023)(J. Gorsuch concurring, joined by J. Sotomayor and J. Jackson). "[I]t has become a tired trope to criticize any reference to the Constitution's original meaning as (somehow) both radical and antiquated. Seeking to

---

jury in 1797, he told the grand jury that "[y]our duty is not to decide on the guilt of any person, but only to enquire, whether there be sufficient probable cause of his being guilty." But, just two lines later he also instructed them that, "I think you cannot be justified in finding a bill, unless the evidence be such against a person, as, in your opinion, would be sufficient to convict on final trial."

9

understand the Constitution's original meaning is part of our job." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 141 S. Ct. 1017, 1039 n. 5 (2021)(Gorsuch and Thomas concurring).

**II.     The Government and Court Below Cite Nothing But Dicta.**

Not once has the Supreme Court been asked to rule on the appropriate standard. Rather, it was simply assumed within *dicta*. "[B]road language unnecessary to the Court's decision cannot be considered binding authority." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,* 551 U.S. 449, 476 (2007). "Dictum settles nothing, even in the court that utters it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 352 n.13 (2005). "[E]ven repeated dicta does not constitute precedent." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022). As the Eighth Circuit recently made clear, "[a]lthough we give Supreme Court dicta more weight than other judicial dicta as a prophecy of what the Court might hold, it is not binding." *Dahle v. Kijakazi*, 62 F.4th 424, 428 (8th Cir. 2023).[11] Here, given the recent commitment of the Supreme Court to originalism, the dicta cited by the Government is entitled to even less weight "as a prophecy."

The Report and Recommendation found that *Beavers'* reference to probable cause was not dicta. *See* Doc. 80 at 14-15. Defendants disagree. To determine what is dicta, the Supreme Court has repeated stated, "we are not bound to follow our dicta in a prior case **in which the point now at issue was not fully debated**." *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, 363 (2006) (emphasis added); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 737 (2007) (same). When the Court has "never squarely addressed the issue, and [has] at most assumed the [legal conclusion], we are free to address the issue on the merits." *Brecht v. Abrahamson*, 507

---

[11]*See also*, *New Doe Child #1 v. United States,* 901 F.3d 1015, 1019 (8th Cir. 2018)("While undoubtedly important to our analysis, Supreme Court *dicta* does not dictate the outcome of this case. This court, sitting *en banc*, recently clarified the role of Supreme Court *dicta* in our decision making: "Although panels have held that federal courts are 'bound' by Supreme Court dicta, this goes too far. . . . Thus, like our sister circuits, we respectfully consider the Supreme Court's statements on this issue, but we do not stop our analysis there.").

U.S. 619, 630–31 (1993). Nothing in *Beavers* indicates that the point now at issue (the proper standard of proof for a grand jury) was debated at all. Nothing in *Beavers* suggests either party raised the issue of standard of proof. Rather, the opinion made clear that "The controlling questions to be discussed on this appeal are whether the indictment offered in evidence before the commissioner can be regarded as conclusive evidence against the accused of the facts therein alleged; whether it was competent at all as evidence of such facts, and whether such indictment was entitled to be accorded any probative force whatever." *Id.* at 73. That is not a debate about the grand jury standard of proof.

An example may best illustrate the identification of dicta. In *Payton v. New York*, 445 U.S. 573, 587 (1980), the Court said, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, **assuming that there is probable cause to associate the property with criminal activity."** (emphasis added). Seven years later, the Court made clear that such a statement was merely dicta. "We have not ruled on the question whether probable cause is required in order to invoke the 'plain view' doctrine. Dicta in *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), suggested that the standard of probable cause must be met." *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). *Beavers'* reference to probable cause is no different than the reference in *Payton* the Supreme Court called dicta.

A prior decision's implicit resolution of an issue that was not "raised in briefs or argument nor discussed in the opinion of the Court" is "not a binding precedent." *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37–38 (1952). *See also Waters v. Churchill,* 511 U.S. 661, 678 (1994) ("cases cannot be read as foreclosing arguments they never dealt with."). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be

11

considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

> The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935).

Neither *Beavers* nor any other Supreme Court case has addressed the actual question of what is the proper grand jury standard of proof – in other words, "**the point now at issue was not fully debated**." Others who have studied the question closely have concluded that "[t]here is no Supreme Court decision announcing that the standard for indictment shall henceforth be 'probable cause.'" Niki Kuckes, *"Retelling Grand Jury History,"supra.*

To repeat, "even repeated dicta does not constitute precedent." *Castro-Huerta*, 142 S. Ct. at 2498, and the court is "not bound to follow our dicta in a prior case in which the point now at issue was not fully debated." *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. at 363. The Government cannot point to a single case where the issue of grand jury standard of proof was fully debated and any claim that there is actual Supreme Court precedent is without substance.

Looking at each of the other cases cited by the Court below, none of them involved a question about the proper standard of proof for the grand jury. None looked at whether the lowest standard (probable cause) or some higher standard was appropriate. Each assumed, without any discussion, that the standard was probable cause. For none of the cases was a determination of the applicable standard of proof necessary to the court's decision. In other words, the quoted portions were dicta in each case.

1) *Kaley v. United States*, 571 U.S. 320 (2014) held that defendants were not entitled to challenge grand jury's probable cause determination at pre-trial post-restraint hearing, but there was no debate or argument regarding grand jury standard of proof.

12

2) *Costello v. United States*, 350 U.S. 359 (1956) held that a defendant could be required to stand trial and a conviction could be sustained even if only hearsay evidence was presented to the grand jury which indicted him. There was no debate or argument regarding grand jury standard of proof.
3) *Ex parte U.S.,* 287 U.S. 241 (1932), held where indictment by grand jury is fair on its face, the court, on application, should issue warrant for arrest of accused as matter of course and that the Supreme Court could issue a writ of mandamus. There was no debate or argument regarding grand jury standard of proof.
4) *Gerstein v. Pugh*, 420 U.S. 103 (1975) did not involve the Fifth Amendment at all but only questions involving the Fourth Amendment. The quote in fact comes from a footnote, which is always dicta. There was no debate or argument regarding grand jury standard of proof.
5) *United States v. Calandra*, 414 U.S. 338 (1974) held that a witness summoned to appear and testify before the grand jury may not refuse to answer questions on the ground that they are based on evidence obtained from unlawful search and seizure. There was no debate or argument regarding grand jury standard of proof.
6) *Branzburg v. Hayes*, 408 U.S. 665 (1972) held that requiring newsmen to appear and testify before state or federal grand juries does not abridge the freedom of speech and press guaranteed by the First Amendment. There was no debate or argument regarding grand jury standard of proof.

**III.    A Long-Standing Practice Which Ignores The First 100 Years Could Never Override What Was Clearly Intended Circa 1791.**

The Government below argued these later cases show a "settled and established practice." Doc. 65 at 4. However, recent Supreme Court decisions have shown the limited use that courts should make of "established practices." In *Bruen,* 142 S. Ct. at 2136, the Court stated, "where a governmental practice has been open, widespread, and unchallenged **since the early days of the Republic**, the practice should guide our interpretation of an ambiguous constitutional provision."(emphasis added). One hundred years later is not within the "early days of the Republic." As the *Bruen* Court went on to explain, "we must also guard against giving post enactment history more weight than it can rightly bear." *Id.* "[B]ecause post-Civil War discussions . . . 'took place 75 years after the ratification of the [ ]Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id*., at 2137. The Court continued, "late-19th-century evidence cannot provide much insight into the meaning of the [ ] Amendment when it

13

contradicts earlier evidence." *Id*., at 2154. The only historical evidence the Government or Court below has offered is late-19th century evidence which is inconsistent with Defendants' circa 1791 evidence. But, again, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.,* at 2137. *See also, Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246, 2258-2259 (2020)(a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition.").

**IV.     The Court Lacks Jurisdiction.**

Fifty years ago, courts recognized that a grand jury indictment issued after expiration of its term made the indictment invalid – "an indictment returned by a grand jury sitting beyond its legally authorized time is a nullity." *United States v. Fein*, 504 F.2d 1170, 1180–81 (2d Cir. 1974). The same must be true here. "[T]he fifth amendment precluded any proceeding against an individual for any capital or infamous crime except upon the presentment or indictment of a grand jury." *Id*. A grand jury that operates under the unintended standard of probable cause is not the "Grand Jury" contemplated by the Founding Fathers or, therefore, contemplated by the Constitution. If the meaning of grand jury includes the appropriate standard of proof – that known at the time of the Amendment's adoption – then failure to operate under that standard of proof means the entire operation of the grand jury is illegitimate. Consequently, any indictment arising from such unintended probable cause standard is a nullity. The courts have no jurisdiction over indictments which are null and void.

"[T]he indictment is a nullity necessarily implies that the court was without jurisdiction to hear the case." *United States v. Macklin*, 523 F.2d 193, 196 (2d Cir. 1975).  "The caselaw supports the view that an invalid indictment is a nullity." *United States v. Bolton*, 893 F.2d 894, 899 (7th

14

Cir. 1990); *United States v. Armored Transport, Inc.,* 629 F.2d 1313, 1316 (9th Cir.1980). ("Such a defect—that the grand jury lost its power to hand down indictments—is jurisdictional and may be raised at any time.").

## Conclusion

Courts have fully recognized that the grand jury no longer provides the protection from misguided prosecutors it offered circa 1791. "[O]ver the years, the government prosecutor has gained substantial influence over the grand jury, and subsequently that institution has lost much of its former independence." *U.S. v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). "The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *U.S. v. Dionisio*, 410 U.S. 1, 17 (1973). Rather, "[r]ealistically, federal grand juries today provide little protection for criminal suspects whom a U.S. Attorney wishes to indict." *United States v. Ross,* 412 F.3d 771, 774 (7th Cir. 2005).

"The whole aim of construction, as applied to a provision of the Constitution, is to discover the meaning, to ascertain and give effect to the intent of its framers and the people who adopted it. . . . And, if the meaning be at all doubtful, the doubt should be resolved, wherever reasonably possible to do so, in a way to forward the evident purpose with which the provision was adopted." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 453(1934). As the Supreme Court recognized, the Grand Jury's "historic role [w]as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." Probable cause, something less than a 50-50 probability, was not the protection called for by the Fifth Amendment. Today's probable cause standard does not provide the shield intended by the Fifth Amendment.

For the above reasons, the Indictment is a nullity and must be dismissed.

Dated: January 2, 2024        Respectfully submitted,

**DOWD BENNETT LLP**

By:  */s/ James G. Martin*
     James G. Martin  #33586 MO
     James B. Martin  #70219 MO
     7676 Forsyth Blvd., Suite 1900
     St. Louis, MO  63105
     314-889-7300 (Telephone)
     314-863-2111 (Facsimile)
     jmartin@dowdbennett.com
     jbmartin@dowdbennett.com

     *Attorneys for Defendants Sonny Saggar*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 2, 2024, a copy of the foregoing was filed electronically via this Court's CM/ECF system, and therefore served on all parties of record.

                    /s/ *James G. Martin*
                    James G. Martin

16